# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CHRISTOPHER MOSS,
                Plaintiff,

      v.                                      Case No.: 3:17cv408-RV/EMT

PAV'R CONSTRUCTION INC.,
and MICHEL J. BRETON,
                Defendants.
_____/

## ORDER

Michel J. Breton is the owner of Pav'R Construction Inc. (PRC). PRC is a small business in Pensacola, Florida—with three to five employees—that lays brick pavers. The plaintiff, Christopher Moss, worked for Breton and PRC (jointly, the defendants) as a driver and operator for four months. He was paid $16 per hour, which was more than double the federal minimum wage of $7.25.

It is undisputed that the plaintiff broke multiple pieces of company equipment during his brief stint with the defendants, causing thousands of dollars in damage.[1] It is also undisputed that, on January 9, 2017, he was told that he would have to pay for some of the broken equipment, in response to which he "walked off" the job and quit. The defendants thereafter withheld his final paycheck—for 34.25 hours of work—to compensate them for a small portion of the equipment that he broke. This technically meant that he was paid less than minimum wage for that one pay period. Withholding his final paycheck (instead of, for example, having him pay for the broken equipment

---

[1] The defendants have stated without contradiction that plaintiff broke a winch cable; tore the angle-iron guard rail off a trailer; "rolled over" a control box and rendered it inoperable; and left a dump truck unattended with the hoist engaged, which caused the motor to "burn up" and a hydraulic fluid spill, along with additional damage.

via installments) was a violation of the Fair Labor Standards Act (FLSA), which is a federal statute that provides minimum wage and overtime protections for employees. If an employer violates the FLSA willfully (that is to say, with knowledge or reckless disregard), the employee can recover the full wages owed plus double that amount in liquidated damages. The wages withheld in this case totaled $248.31. Thus, assuming that the defendants violated the statute willfully, it is undisputed that the plaintiff was owed—at most—$496.62.[2] The statute further provides that prevailing plaintiffs are entitled to reasonable attorney fees.

In February 2017, the plaintiff hired J.J. Talbott, an experienced FLSA lawyer. Four months later, on June 14, 2017, Talbott filed this action against Breton, PRC, and a second company that Breton owned, Pav'R Construction of Pensacola Inc (PRCP). The complaint alleged, in general, that Breton and both of his companies had violated the FLSA's minimum wage provision.[3] As the action proceeded, it soon became clear that PRCP—which operated exclusively out of Mississippi and had never employed plaintiff—had been sued in error. However, Talbott made no attempt to abandon his claim against that entity. In fact, even after Breton testified at his depositions (both in his individual capacity and as corporate representative) that plaintiff never worked for the company, and even after the plaintiff himself testified at deposition that he had no evidence to the contrary (and that he didn't know of "any reason" why the company had been sued in the first place), Talbott kept PRCP in the case.

---

[2]

As will be seen later, the plaintiff originally believed that he had worked 42 hours (*i.e.*, two hours overtime) his final week on the job. Based on those hours, he thought that he was owed $372 in unpaid wages (not $248.31), potentially resulting in $744 with liquidated damages (not $496.62). However, the time records show—and the parties now agree—that he only worked 34.25 hours his last week. Therefore, $248.31/$496.62 are the correct figures.

[3]

The complaint alleged a violation of the FLSA's overtime provision as well, but, as stated in *supra* note 2, time records showed that the plaintiff was mistaken in thinking that he had worked overtime his final week. He later conceded there was "no basis whatsoever" for his overtime claim, and he voluntarily dismissed it. The overtime claim will not be discussed further in this order.

As will be set out in much greater detail *infra*, the parties engaged in settlement discussions throughout this case without success. At one point during the discussions, on January 19, 2018, the defendants served plaintiff with an Offer of Judgment under Rule 68 of the Federal Rules of Civil Procedure. Intended to encourage settlement of claims and discourage protracted litigation, Rule 68 states, in relevant part, that "[i]f the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d). The defendants' Offer of Judgment read as follows:

> Defendants hereby offer to allow Judgment to be entered against them in this action in the amount of $496.62, plus reasonable attorneys' fees and costs. This Offer of Judgment is made for the purposes specified in Federal Rule of Civil Procedure 68[.]

The plaintiff did not accept this offer within 14 days, so by operation of the rule it was "considered withdrawn." *See* Fed. R. Civ. P. 68(a)-(b). The case then continued over the next few months, during which a shockingly large amount of discovery was done, including interrogatories, requests for production, and at least nine depositions.[4]

On April 30, 2018, PRCP moved for summary judgment on the ground that it never employed the plaintiff. The plaintiff filed a nine-page response to that motion (along with 47 pages of exhibits). He said at the end of his response that he "does not disagree" with PRCP, and he concluded with the following: "Plaintiff does not dispute the arguments raised in Defendant Pav'R Construction of Pensacola, Inc.'s Motion for Summary Judgment and the claims brought against Pav'R Construction of Pensacola, Inc., are due to be dismissed." I granted PRCP's motion, and the company was finally dismissed from the case on June 20, 2018.

---

[4]    While written discovery and nine depositions might not be considered inordinate in a typical federal lawsuit, it was objectively excessive here in light of the simple (and mostly undisputed) facts and minuscule damages at issue.

That left the minimum wage claim against Breton and PRC. On May 1, 2018, the plaintiff filed a 31-page motion for summary judgment (along with 90 pages of exhibits), seeking final judgment on that claim. In his motion, the plaintiff requested judgment in the amount of $496.62 (the same amount that defendants had agreed to pay several months before), and he indicated that he was planning to request attorney fees as the prevailing party. This motion was basically stipulated (at least with respect to the $496.62) because the defendants agreed in their response—as they did in their prior Rule 68 offer—to judgment being entered against them in the full amount. Even though the defendants specifically agreed to pay the $496.62 in their response, Talbott filed a 10-page reply to that response, "respectfully request[ing] that this Court find that Plaintiff is owed $248.31 (34.25 x $7.25/hr), plus an equal amount of liquidated damages, for a total of $496.62."

I granted the plaintiff's motion for summary judgment by order dated June 20, 2018, and I awarded him the stipulated $496.62 in damages.[5] I noted in my order that awarding the plaintiff his damages meant he was the "prevailing party," but I went on to say the following:

---

[5]

The plaintiff has maintained that because I awarded him full damages, that necessarily means I found the defendants violated the statute willfully (doc. 42 at 27 ¶8; doc. 51 at 7 ¶17). The plaintiff is incorrect.

In response to the plaintiff's motion for summary judgment, the defendants agreed that they owed him $248.31 in wages since withholding his final paycheck "technically" violated the FLSA. However, they stated that they didn't know that at the time ("Breton, an exceedingly small business owner, surely did not know he could not make the withholding"), by which they were arguing that they didn't violate the statute willfully. Despite their contention that they didn't act willfully—and, therefore, should not have to pay liquidated damages—the defendants stipulated to a final judgment that provided the plaintiff with double damages because "the sum in question is minuscule" and "too small of a sum to dispute." I entered judgment in plaintiff's favor and awarded liquidated damages based on that stipulation; I did *not* make an express finding as to willfulness. So, although I have and will refer to $496.62 as the amount that plaintiff was owed under the statute, it could actually be as little as $248.31.

> Although there is no motion for attorney fees pending at this time, it is expected that one will be filed. Before the parties expend the energy, however, the plaintiff should be advised that based on the particular facts and record of this litigation (including, *inter alia*, the exceedingly small amount of damages at issue and the fact that defendants previously stipulated to a judgment in that amount), I am not inclined to award much—if anything—more than a nominal fee award.

There are two motions now pending. First, the defendants have filed a motion under Rule 68 to recover their post-offer costs (doc. 39). This motion is unopposed. And the plaintiff, undeterred by the warning in my June 20th order, has filed a motion seeking $28,351.00 in attorney's fees that he incurred in pursuing this $496.62 claim (doc. 42) (Pl. Mot.). The defendants have filed a lengthy response in opposition to that motion (Def. Resp), and the plaintiff filed a reply to that response (Pl. Reply).

## I. Discussion

### A. The Defendants' Motion for Costs

As previously noted, Rule 68 provides that if an Offer of Judgment is made under the rule and that offer is not accepted, and the offeree later fails to obtain more than the amount that was offered, the offeree must pay the offeror's post-offer costs. *See* Fed. R. Civ. P. 68(d). Here, the plaintiff did not obtain more than the unaccepted offer (in fact, it was the exact same amount). The defendants argue—and, notably, the plaintiff does not dispute—that Rule 68 entitles them to all their post-offer costs, and those costs total $1,133.54.[6]

---

[6]

In FLSA cases, it is well established law that attorney fees are not considered "costs" (and therefore do not shift) under Rule 68. *See Arencibia v. Miami Shoes Inc.*, 113 F.3d 1212, 1214 (11th Cir. 1997); *Grau v. RWB/Linares Architecture Inc.*, 2007 WL 9701755, at *1 (S.D. Fla. 2007) (citing *Arencibia* and noting same); *accord, e.g., Haworth v. Nevada*, 56 F.3d 1048, 1051 (9th Cir. 1995) (citing *Fegley v. Higgins*, 19 F.3d 1126 (6th Cir. 1994), and *Cox v. Brookshire Grocery Co.*, 919 F.2d 354 (5th Cir. 1990)). Accordingly, the defendants are not entitled to—and have not requested—their attorney fees as costs pursuant to Rule 68.

Upon review, the defendants' unopposed motion for costs under Rule 68 is well taken. The motion is GRANTED, and the defendants are awarded $1,133.54 in costs.

### B. The Plaintiff's Motion for Attorney Fees

If a plaintiff prevails on an FLSA claim—as the plaintiff here did—the statute expressly provides the district court "*shall . . . allow a reasonable attorney's fee to be paid by the defendant*[.]" 29 U.S.C. § 216(b) (emphasis added). As a general matter, then, attorney fee awards are "mandatory." *See, e.g., Kreager v. Solomon & Flanagan, P.A.*, 775 F.2d 1541, 1542 (11th Cir. 1985) (noting same). However, while fee awards are said to be mandatory, district courts have very broad discretion in determining the amount of the award. *E.g., Uphoff v. Elegant Bath*, 176 F.3d 399, 406 (7th Cir. 1999) ("While the award of fees [under the FLSA] is mandatory, the district court has 'wide latitude' in determining the amount of the fee.") (citation omitted); *Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994) ("An award of attorney fees to a prevailing plaintiff [under the FLSA] is mandatory, but the amount of the award is within the discretion of the judge.") (citing *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G&M Roofing & Sheet Metal Co. Inc.*, 732 F.2d 495, 501 (6th Cir. 1984) ("It is long established that an award of attorney fees under § 216(b) is mandatory but the amount awarded is within the discretion of the district court.") (citation omitted)); *Burnley v. Short*, 730 F.2d 136, 141 (4th Cir. 1984) ("The payment of attorney's fees to employees prevailing in FLSA cases is mandatory. 29 U.S.C. § 216(b). The amount of the attorney's fees, however, is within the sound discretion of the trial court.").

How broad is this discretion? In *Sahyers v. Prugh, Holliday & Karatinos P.L.*, 560 F.3d 1241 (11th Cir. 2009), the Eleventh Circuit agreed with the district court in that case that "'there are some cases in which a reasonable fee is no fee.'" *Id.* at 1244.

In his motion for attorney fees, the plaintiff contends that because he obtained a $496.62 judgment and was the prevailing party, he is entitled to recover his fees—all $28,351.00 of them. *See* Pl. Mot. at 16-29. He concedes that the unpaid wages at issue in this case were "minimal," but he points out that there is no rule that says fees have to be "proportionate to the amount recovered." *See id.* at 3-5. That is true enough, as far as it goes. Indeed, the Supreme Court observed in *City of Riverside v. Rivera*, 477 U.S. 561 (1986)—a civil rights case—that a rule requiring proportionality between a plaintiff's recovery and his attorney's fee "would make it difficult, if not impossible, for individuals with meritorious . . . claims but relatively small potential damages to obtain redress from the courts." *Id.* at 578; *accord Pyczynski v. Kirkland's Stores Inc.*, 2008 WL 544864, at *5 (M.D. Fla. 2008) (applying *Riverside* to FLSA claim); *Powell v. Carey Int'l Inc.*, 547 F. Supp. 2d 1281, 1286 (S.D. Fla. 2008) (citing *Riverside* and noting that, "'under the FLSA, it is not uncommon that attorneys' fee requests will exceed the amount of judgment in the case'") (additional citation omitted).

The defendants respond, however, that the plaintiff should not be awarded any fees in this case—not because of some non-existent rule requiring proportionality, but, rather, because Talbott acted in bad faith and "churned" the file solely to run up fees. *See* Def. Resp. at 8, 16, 23 (arguing that Talbott always "intended to run up attorney's fees unnecessarily by tens of thousands of dollars" with "hyper-inflated" billing that is "nothing short of a disgrace").[7] After noting that the plaintiff had rejected their Rule 68 offer, the defendants assert that courts should not "award an attorney who uses a nominal monetary dispute in order to 'justify' an exorbitant sum solely to the benefit of plaintiff's counsel and to the detriment of all parties as well as the judiciary." *Id.*

---

[7]    In fact, the defendants point out they could move for their own attorney fees. *See* Def. Resp. at 29-31; *see also Gathagan v. Rag Shop/Hollywood, Inc.*, 2005 WL 6504414, at *3 (S.D. Fla. 2005) (FLSA defendant entitled to fees if case was filed in bad faith). However, the defendants decline to pursue that avenue here because "realistically such a motion would further burden the court without any meaningful likelihood of recovery against the plaintiff." Def. Resp. at 31.

at 24-29. For this argument, the defendants cite *Sahyers* and several other cases—two of which require close attention.

First, the defendants cite *Haworth v. Nevada*, 56 F.3d 1048 (9th Cir. 1995). The plaintiffs in *Haworth* were "cottage parents" (*i.e.*, husband-and-wife teams who lived with and supervised abused or neglected children), and they filed suit against the State of Nevada asserting several different theories and claims for unpaid wages under the FLSA. The State conceded one portion of their claim, but not the others. Prior to trial, the State made a Rule 68 Offer of Judgment, which the plaintiffs did not accept. The case proceeded to a bench trial, where the district court rejected all of the plaintiffs' claims except the conceded one and awarded them $91,782.54 in damages, which was $240,000 *less* than the Rule 68 offer. On post-trial motion, the district court awarded plaintiffs all their attorney fees ($85,975), but in doing so the court failed to account for the fact that plaintiffs had rejected the Offer of Judgment. In reversing the district court on this point, the Ninth Circuit said the following:

> In the present case, other than the one FLSA violation Nevada conceded, the plaintiffs succeeded on not a single theory at trial. And, even on the conceded claim, the plaintiffs failed to recover the damages they sought. They recovered a judgment which was close to a quarter of a million dollars less than they could have had by accepting the Rule 68 offer. *Clearly, the only one who benefited by pursuing the litigation after the Rule 68 offer was made was the plaintiffs' attorney.*
>
> Although the clients, and not the attorney, are the ones to decide whether to accept a settlement offer, clients who refuse a Rule 68 offer should know that their refusal to settle the case may have a substantial adverse impact on the amount of attorney fees they may recover for services rendered after a settlement offer is rejected. *Just because a plaintiff has an FLSA violation in her pocket does not give her a license to go to trial, run up the attorney fees and then recover them from the defendant.*

*Id.* at 1052 (emphasis added). The Court of Appeals then continued:

> When a plaintiff rejects a Rule 68 offer, the reasonableness of an attorney fee award under the FLSA will depend, at least in part, on the district court's consideration of the results the plaintiff obtained by going to trial compared to the Rule 68 offer. This application of Rule 68 has the salutary benefit of encouraging settlement of cases that should be settled when reasonable settlement offers are made.
>
> The Supreme Court has noted that the Rule 68 goal of encouraging settlement is compatible with the goal of shifting fees in vindicating civil rights. We find this reasoning persuasive and hold that in an FLSA case when a Rule 68 offer of judgment has been rejected, and judgment is obtained for less than the settlement offer, these circumstances must be considered by the district court in determining what fee is reasonable.

*Id.* (citing *Marek v. Chesny*, 473 U.S. 1 (1985)). In deciding what fee is "reasonable" when a plaintiff rejects a Rule 68 Offer of Judgment and the judgment later obtained is not greater than the offer, the Ninth Circuit said that district courts should consider "the amount of the Rule 68 offer, the stage of the litigation at which the offer was made, what services were rendered thereafter, the amount obtained by judgment, and whether it was reasonable to continue litigating the case after the Rule 68 offer was made." *See id.* at 1052-53. The Court of Appeals emphasized that "[t]he enumeration of these factors is not meant to be an exhaustive list. The district court may take into consideration such other factors as it deems appropriate in determining the amount of reasonable attorney fees to be awarded." *Id.* at 1053.[8]

---

[8] Although *Haworth* is out-of-circuit and not binding, it appears to be the leading case on this subject and has been cited with approval and relied upon by numerous district courts in the Eleventh Circuit. *See, e.g., Johnson v. Bay Bays Chicken & Waffles, LLC*, 2017 WL 5952895, at *4 (S.D. Fla. 2017); *Payne v. River Rocks LLC*, 2017 WL 976634, at *7 (M.D. Fla. 2017); *Klein v. Floranada Warehouse & Storage*, 2016 WL 8671074, at *3-4 (S.D. Fla. 2016); *Smith v. Werner Enterprises,*

The second notable case that defendants cited is *Goss v. Killian Oaks House of Learning*, 248 F. Supp. 2d 1162 (S.D. Fla. 2003). The plaintiff there, as here, worked for her employer for a short period of time, during which she damaged property that belonged to the company. *See id.* at 1164. She was terminated, but due to the "normal payroll cycle," her last paycheck failed to compensate her for the final two days of her employment, which was at most $315.89. *See id.* at 1164-65. The defendants later issued another check that included payment for the two missing days—and they made that check available to her—but the plaintiff refused to pick it up. *See id.* Instead, she hired an attorney, Donald J. Jaret, and filed a lawsuit. *See id.* Early on in the case, the defendants' lawyer tried to settle the case for the $315.89 that the plaintiff was owed, but Jaret said that he needed "time and formal discovery to investigate this claim," so the attorney fee clock started ticking. *See id.* Eventually, the defendants cut another check for $315.89, and this time the plaintiff accepted it, thereby technically rendering her the prevailing party. *See id.* 1164-67. She subsequently filed a motion requesting about $16,000 in attorney fees. *See id.* at 1164-65.

The district court began by acknowledging that fees are "mandatory" under the FLSA. *Id.* at 1168. However, the court continued, "an entitlement to attorney's fees cannot be a *carte blanche* license for Plaintiffs to outrageously and in bad faith run up attorney fees without any threat of sanction." *Id.* (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 416 n.5 (1978)). The district court also cited the Ninth Circuit decision in *Haworth* for the principle that courts may consider any factors they deem appropriate in determining the reasonableness of a fee award. *Id.* at 1167. In rejecting

---

*Inc.*, 2015 WL 7185503, at *9 (S.D. Ala. 2015); *Brandt v. Magnificent Quality Florals Corp.*, 2011 WL 4625379, at *6-7 (S.D. Fla. 2011); *Baxter v. Automated Gate Sys., Inc.*, 2011 WL 1790330, at *5 (M.D. Fla. 2011); *Zelaya v. Pak United, Inc.*, 2011 WL 13174409, at *3 (S.D. Fla. 2011); *Ramos v. Goodfellas Brooklyn's Finest Pizzeria, LLC*, 2009 WL 2143628, at *1 (S.D. Fla. 2009); *DaSilva v. Vozzcom Inc.*, 2009 WL 10667450, at *4 (S.D. Fla. 2009); *Anderson v. Unum Life Ins. Co. of Am.*, 2007 WL 604728, at *15 n.15 (M.D. Ala. 2007); *see also Wales v. Jack M. Berry, Inc.*, 192 F. Supp. 2d 1313, 1325 (M.D. Fla. 2001) (stating that *Haworth* sets forth "the appropriate approach").

the plaintiff's argument that her attorney fees were reasonable—and denying her fees altogether—the *Goss* court said the following:

> In light of what is at best, extremely modest damages, Jaret's behavior casts doubt on his insistence that all fees were reasonable. He continued to file pleadings and propound discovery in what should have been a *pro forma* matter that could have been disposed of by making a few phone calls before filing suit. . . .

> Jaret seems to have leveraged a small sum as a stepping-stone to a disproportionately large award of attorney's fees. He admits the disproportionate nature in his reply, but places the blame squarely on Defendants' shoulders. He claims that his entire fee request is reasonable, and further asserts that it is Defendants who are at fault for fighting the litigation in the first place.

> Putting aside for a moment any argument that this case could have been resolved quickly before the case even began if Jaret had acted in good faith, he continuously employed a strategy of delay and obfuscation in his attempt to ward off the inevitable resolution of the case. The first contact made by Defendants' counsel set the tone for a consistent pattern of activity by Plaintiff's counsel that was calculated to "churn" the file and extract as much attorney's fees as possible from what was at best, a modest claim not deserving of the many hours of work.

> Jaret's own records belie Defendants' allegations. The entire record of time spent on the case signals an intention to blindly file pleadings and ignore the actual monetary substance of the dispute. Every action by Plaintiff's counsel it seems was calculated to avoid prompt out-of-court resolution that would have kept the costs of litigation down to any reasonable amount. Indeed, he has the temerity to cloak a case of this frivolous nature in the laudable and salutary policy objectives that the FLSA was enacted to combat.

> To ask in good faith for upwards of $16,000 in attorney's fees for prosecuting a case that Plaintiff's counsel knew would involve no more than a modest sum of $316, and to continue to engage in a pattern of behavior aimed at inflating the levels of attorney's fees shocks the conscience of the Court. It is the functional equivalent of using a sledgehammer to chip away at Jaret's affirmation of good faith. This strategy of "shaking down" Defendants with nightmarishly expensive litigation solely in pursuit of attorney's fees must not be rewarded.
>
> Therefore, the Court finds that it would be unreasonable and indeed, unjust, to force Defendants to pay *any* of Plaintiff's attorney's fees, since the suit was frivolous in the first instance and Plaintiff's counsel grossly exaggerated the amount of hours expended. If the award of any amount of attorney's fees in this case is not flatly unreasonable, then the Court struggles to envision a scenario of reasonableness.

*Id.* at 1168-69 (footnote omitted).

Numerous cases are in accord. In *Nelson v. Kobi Karp Architecture & Interior Design,* 2018 WL 3059980 (S.D. Fla. 2018), for example, the plaintiff alleged that her employer had failed to pay her for two days of work, a claim that was worth (at most) $232. *Id.* at *1. She hired an attorney who, instead of calling her employer to try and resolve the matter, filed a case under the FLSA. *Id.* Her employer tendered payment, thus making her the prevailing party, and the plaintiff moved for $9,065 in attorney's fees. *See id.* After citing and discussing *Sahyers* and *Goss*, the district court denied her motion, concluding that plaintiff's counsel's "sole intent" was to "run up his bill" and, under such circumstances, "the Court finds it unreasonable, unjust, and inequitable to award Plaintiff *any* fees." *Id.* at *2-3 (emphasis added); *see also Woods v. On Baldwin Pond*, 2016 WL 4927639 (M.D. Fla. 2016) (plaintiff moved for $48,028.75 in fees after he obtained "a nominal judgment" of $720; citing *Sahyers* and *Goss*, the district court denied the motion and awarded no fees because, although fees are "generally"

available to prevailing plaintiffs, "there are special circumstances where 'a reasonable fee and cost award [is] zero,'" and a lawyer trying to "shake down" an employer in a case involving "minuscule damages" presents such a circumstance).

Based on the foregoing, it appears to be well established that district courts have the authority to deny attorney's fees to prevailing plaintiffs—even in the "mandatory" FLSA context—if the court finds that the prosecution of the case was in bad faith.

In his reply to the defendants' response, Talbott doesn't dispute that I have the authority to deny him attorney fees *if* I find that he acted in bad faith. He just argues that he didn't act in bad faith. In fact, apparently believing the best defense is a good offense, he insists that he made repeated efforts to settle this case, but the defendants' attorney resisted his settlement efforts because *he* was the one trying to "r[u]n up the bill." *See* Pl. Reply at 11; *accord id.* at 1-8 (detailing the history of negotiations in this case and stating "Plaintiff believes Defendants are projecting their own behavior onto Plaintiff in an attempt to obfuscate the record of their actions"). Thus, Talbott argues that "every hour" he spent on this lawsuit was necessitated by his opposing counsel's misconduct; if I were to find otherwise, Talbott argues in the alternative that he is at least entitled to the fees that he incurred *before* the Rule 68 offer. *See id.* at 9-11.

In light of these competing allegations of bad faith—and before I can rule on the propriety of a fee award in this case (whether it's $28,351.00, zero, or somewhere in between)—I must analyze the entire record to determine who is really responsible for a federal court having to spend more than a year presiding over a $496.62 claim.

(i)

The complaint that Talbott filed in this case was largely boilerplate (doc. 1). It alleged, in relevant part, that the defendants failed to pay the plaintiff minimum wage. *Id.* at ¶¶36-47. From the face of the complaint, it appeared that plaintiff was alleging he had been denied minimum wage for most (if not all) of his employment. *See id.* at ¶¶31, 40 (alleging that he "regularly worked" for less than the minimum wage). There

was no mention anywhere in the complaint that this case was limited to the defendants improperly withholding his final paycheck.[9]

The defendants were served with the summons and complaint on September 18, 2017 (docs. 5, 6, 7). The following week, on September 25, 2017, Breton personally sent a letter to Talbott via certified mail (doc. 14-1 at 11). Breton attached to his letter "the pay rate and hours Mr. Moss has worked for Pav'R," and he concluded the letter with the following: "Contrary to his claim Mr. Moss was paid $16.00/hr. . . . Trusting this information is satisfactory." *See id.* Rather than call Breton to try and resolve the dispute—and explain to him that the problem was the withholding of plaintiff's final paycheck, not his normal rate of pay—Talbott took no action on the letter.

Apparently believing that the September 25th letter was "satisfactory" to show that plaintiff was paid minimum wage, the defendants did not answer the complaint. On November 3, 2017, after the time ran for them to do so, Talbott filed three motions for a clerk's default against each defendant on the ground that "no response from the defendant . . . has been filed with the Court" (docs. 8, 9, 10). The clerk entered default that same day (doc. 11).

On November 14, 2017, Attorney Bradley Odom filed an appearance on behalf of the defendants and answered the complaint (docs. 12, 17). He also filed a motion to vacate the clerk's default (doc. 13), which I granted (doc. 18).[10] At some point that same day, Talbott and Odom spoke about the lawsuit. Talbott later memorialized this

---

[9]

To be clear, I am not suggesting that the complaint was deficient under Rule 8 of the Federal Rules of Civil Procedure, which merely requires a "short and plain statement." I am only noting that the complaint failed to make clear what this lawsuit was about because, as will be seen above, it led to some initial confusion and unnecessary early motions in the case.

[10]

Odom filed an affidavit along with his motion to vacate the default in which Breton averred: "Last week I received a Motion for Default via mail which claims that I did not 'file' a response with the Court. At a minimum, I think that representation was disingenuous, as plaintiff's counsel clearly knew of the Answer I had sent him (Exhibit 2) and that his office had signed as having received it (Exhibit 3). It also does not appear that plaintiff's counsel was being candid with the Court by not advising it of what I had sent him" (doc. 14-1 at 3 ¶9).

conversation in a letter dated November 16, 2017. The letter read in pertinent part:

> I'm writing in follow up of our conversation on November
> 14, 2017 . . . . I advised you that the unpaid wages were not
> a large amount. Please be advised that we're talking about
> my client's last week of pay, which was 42 hours. As such,
> the unpaid wages are $372 plus an equal amount of
> liquidated damages for [a] total of $744 plus attorney fees
> and costs.
>
> Considering the small amount of this case, this seems like
> it should be a case that is easily resolved between the
> parties. As such, please consult with your client and see if
> we can resolve this case soon.

(doc. 42-1 at 3).

Odom responded by letter six days later, on November 22, 2017 (doc. 46-1 at 5-6). He began by noting that the plaintiff had only worked 34.25 hours his final week (not 42) and that he was therefore only owed $248.31 (not $372). *See id.* at 5; *see also supra* note 2. He then explained that plaintiff's final paycheck was withheld because he had "repeatedly damaged" company equipment and that he quit instead of paying back the "several thousand" dollars that he owed (doc. 46-1 at 5). Odom continued:

> I acknowledge that there may be an argument that Pav'R
> Construction should have made the withholdings
> periodically as opposed to all at once. I hardly think this
> constitutes a willful violation, however. I also know that it
> does not absolve the underlying debt, as Pav'R
> Construction is clearly owed more than what Mr. Moss
> contends he is owed. We could clearly amend our Answer
> to include a counterclaim.

*Id.* Instead of filing a counterclaim, however, Odom agreed that settlement would be preferable because "[e]arly resolution would be beneficial to both parties" and "would avoid needless accumulation of attorneys' fees and costs, most of which would almost certainly appear on the counterclaim." *Id.* at 6. The letter concluded:

> In light of the above, Pav'R Construction has authorized me to offer to settle all FLSA issues in this cause by (1) tendering a check to Mr. Moss in the amount of $248.31, minus standard payroll deductions; and (2) tendering a check to your firm in the amount of $1,000 for attorney's fees and costs. I believe both offers to be more than generous, especially in light of Mr. Moss' having quit in order to avoid his debts.
>
> *This offer will remain open for ten days from today's date and be deemed to have expired and be withdrawn if not accepted within that time-frame.*

*Id.* (emphasis added). Talbott did not respond to this letter.

It appears that the next time the parties discussed settlement was at the parties' planning meeting held three weeks later, on December 13, 2017. More than one week after the planning meeting was held, on December 22, 2017, Odom sent an email that said the following:

> By way of this e-mail I wanted to follow-up with you on the parties' planning meeting which we held on Wednesday, December 13, 2017. *As was discussed during that meeting, you had apparently not received or discussed with your client my November 22, 2017 correspondence*; accordingly, you indicated that you would do so. Nevertheless, we proceeded with discussing the subjects required by the Initial Scheduling Order.
>
> Since then, over a week has gone by, and I have heard nothing from you in reference to either settlement or the report of the parties' planning meeting. With Christmas rapidly approaching and our Report being due on Wednesday, December 27, 2017, I therefore proceeded with preparing a proposed Report of Parties' Planning Meeting. Please find that document enclosed. I believe that it accurately reflects what we discussed, but please let me know if your sentiments have since changed.

(doc. 46-1 at 15) (emphasis added).[11]

Talbott did not respond to Odom's December 22nd email. Five days later, on December 27, 2017, Odom sent a second email that read: "As you know, the Report of Parties Planning Meeting is due today. Nevertheless, I have still not received a response to the e-mail I sent you on Friday [December 22], along with the attached report" (doc. 46-1 at 14). After that second email, there were a number of emails back and forth between the attorneys. *See id.* at 10-14. These emails largely centered on the Report of Parties' Planning Meeting that Odom had drafted but Talbott was wanting revised to provide for extended dates (of more than two and a half months) to account for "various issues" and "a significant number of documents to produce." *Id.* Odom replied to Talbott at 2:39 p.m. on December 27th with the following email:

> We discussed the issues in the case during the parties' planning meeting. We both agreed that the case was very straightforward, in light of the limited issues. All of that was discussed before we both agreed to the April 10, 2018 date for discovery cutoff.
>
> The Initial Scheduling Order indicates that the discovery cutoff date, as established by the Court, was April 10, 2018 and that "no extension of time" would be granted unless there was good cause to do so. Based upon the narrowing of the issues which has occurred, I simply know of no good cause that I could truthfully represent to the Court as being in existence.

---

[11]

Insofar as Talbott told Odom at the planning meeting that he had "not received or discussed" Odom's November 22nd settlement offer with his client, that was demonstrably untrue as his billing records for that day specifically state that Talbott himself "draft[ed] letter to client regarding offer" (doc. 42-7 at 11).

In any event, Talbott says he didn't accept Odom's initial offer because, among other things, $1,000 in attorney fees and costs would not adequately compensate him because he had by that point "already expended approximately 12 hours of attorney time on this Case, with costs of over $400." Pl. Reply at 3 ¶5. I will discuss Talbott's billing practices in Section I.B(ii) *infra*.

*Id.* at 12. Talbott responded by saying: "I need to set the depos of your clients. I need 7 hours for each Defendant so please give me 3 days for each. Also, I am sending you my initial disclosures today and need 4 hours for each person." *Id*. Odom replied:

> As for your suggestion that you need 40 or more hours for depositions in a case which you have acknowledged to be straightforward, I find that hard to believe. As we discussed during the parties' planning meeting, Pav'R Construction, Inc., is the proper defendant, and Pav'R Construction of Pensacola, Inc. is not. Your response at the parties' planning meeting was that as long as you had a proper defendant, that was really what you cared about, especially given the low value of the amount in controversy. Now, however, you claim that you want to schedule seven hours for Pav'R Construction, Inc., seven more hours for Pav'R Construction of Pensacola, Inc, and then seven more hours for Mr. Breton. This seems more akin to a fishing expedition than a real effort to obtain discoverable information. In fact, I believe that to be your merely following-up on your statement yesterday that you intended to run up attorney's fees unnecessarily by tens of thousands of dollars in order to increase the "damages" and exposure to the defendants. All of that can be taken up with the court later, however, if necessary.
>
> At the parties' planning meeting, we had discussed the prospects of early settlement. You acknowledged that you had not reviewed my prior letter regarding settlement dated November 22, 2017, and you indicated that you would do so, discuss it with your client, and promptly respond. We have received no such response. Therefore, we had no choice but to propound discovery. You have now done the same. That all seems to be part of the strategy which you articulated yesterday as an effort to run up fees on a modest case. If I am incorrect, however, and you actually want to explore settlement in earnest, please feel free to respond to my prior letter dated November 22, 2017.

*Id.* at 11-12.

Talbott replied by email on December 28, 2017 (doc. 46-1 at 11). He generally denied that he was trying to run up fees, and he finally—for the first time—responded to Odom's November 22nd settlement offer. *Id.* He rejected that offer, but he said they would settle for $543.38, including liquidated damages, plus attorney fees and costs. *Id.* Odom responded by email saying that he would need to know what fees and costs Talbott was claiming so he could discuss it with Breton. *Id.* at 10. When Talbott failed to respond (again), Odom sent a follow-up email six days later, on January 3, 2018, asking when he should "expect a response . . . so that I may discuss the subject with my client." *Id.* Talbott sent an email later that day which read: "I have about 15 hours in the case, associate hours are 3.6, and paralegal hours are 2.4. Costs are 450." *Id.*

Two days later, on January 5, 2018, Odom wrote a letter to Talbott (doc. 46-1 at 19-20). Odom pointed out that the plaintiff had only worked 34.25 hours during his final week on the job, which equated to $248.31. *Id.* at 19. Thus, assuming a willful violation, he was at most entitled to $496.62 (not $543.38). *Id.* Although Odom stated that he believed it "highly improbable" that plaintiff could prove a willful violation, he said that "arguing over such a sum borders upon ridiculousness." *Id.* Therefore, the defendants were willing to pay plaintiff the full $496.62 to settle his claim. *Id.* As for attorney fees and costs, Odom said:

> Although I received your January 3 e-mail regarding fees and costs, I noted that no particular demand was made. I also find it incomprehensible that you could have yet expended the hours which you claim. Regardless, I think we all recognize that only reasonable fees are recoverable, and my experience with the local federal judiciary is that it rigidly enforces that reasonableness requirement, recognizing which cases are complex and which are routine and rather form-driven. Clearly, this case is the latter. In recognition of that and all other relevant factors, including the fact that this case remains in its infancy and in an effort to achieve prompt resolution, defendants are willing to offer $2,000 for attorneys fees and costs.

*Id.* at 19-20. The letter concluded by saying the offer would expire if not accepted by close of business on Wednesday, January 10, 2018. *Id.* at 20. As had been his practice up to this point, Talbott did not respond.

On January 11, 2018, Odom sent an email to Talbott asking: "Did you intend to respond to the settlement offer contained in my January 5, 2018 letter[?]" (doc. 46-1 at 25). Talbott responded by email shortly thereafter, saying that the plaintiff *would* accept the $496.62. *Id.* However, the email continued, "[w]hile I am willing to work with your client on the fee, $2,000 is unacceptable." *Id.* When Odom responded and asked if there was a counter proposal, Talbott said he would be willing to "reduce" his fee and accept $7,100, including costs. *Id.* At this point in the case, it appeared that little had been done (*e.g.*, a boilerplate complaint had been filed; a parties' planning meeting had been held; and form discovery had been exchanged but not responded to). So, Odom responded to Talbott's $7,100 proposal by asking if he had "a reasonable number" to suggest instead, because "I do not see any way that could possibly fly[.] My client has been reasonable, but you seem to be asking it to negotiate against itself. Please advise if you really want to get this thing done or not." *Id.* at 24.

Talbott responded by email later that same day (doc. 46-1 at 24). He said that he would be willing to look back over his time sheets, but in the meantime he wanted Odom to confirm "that we have an agreement to resolve my client's claim and these matters [fees and costs] are supposed to be resolved separately." *Id.* Odom answered with an email saying: "We have done everything separately, but to settle we have to have an agreement on all issues, and there is simply no way that I could recommend fees in that range on a case which involves a one-week dispute, especially where the case is in its infancy. I need a reasonable number if the case is going to settle." *Id.* at 23.

The parties thereafter sent several emails back and forth, and I will reproduce them verbatim below:

From Talbott
January 12, 2018 at 4:20 p.m

Bradley—I asked if your client was willing to agree to the settlement with my client and you will not respond. I am sure that you understand that the unpaid wages and the fees have to be negotiated separately and one would not be contingent on the other. Based on your email, you are refusing to do so and I have no alternative but to proceed forward with litigation. If I am incorrect and your client will agree to settle the case with my client, please advise. Thanks.

From Odom
January 12, 2018 at 4:38 p.m

I see nothing vague or ambiguous about my response. We have been negotiating separately throughout. Do you have a reasonable number for attorney fees and costs or are you refusing to provide one?

From Talbott
January 12, 2018 at 4:58 p.m.

Bradley—Please confirm whether we have resolved my client's claim for unpaid wages. Specifically, my client will agree to accept the amount you listed in your letter. Despite lumping that offer together with the offer for attorney fees, I need to know if the issue is resolved. To make it easier, please put an "X" by the statement below that applies

_____ Yes we have settled the claim for unpaid wages payable to the claimant for $496.62?

_____ No we have not yet settled the claim for unpaid wages payable to the claimant for $496.62?

From Odom
January 17, 2018 at 9:40 a.m.

In my opinion, these negotiations border upon the absurd, and there is no reason to re-plow ground with alleged confusion where there is none. My January 5 letter stated, in relevant part, "defendants offer $496.62 to settle all claims which plaintiff has or could have raised as a result of his employment with defendants." That letter then moved on to the other component which was an offer to settle the attorney's fees. Six days later you indicated that your client would accept the offered amount but indicated that the other component was unacceptable. You asked for $7,100 for attorney's fees and costs. I responded by asking you to advise if you really wanted to get this thing done or not, as that was not a reasonable number and I did "not see any way that could possibly fly[.]" That is where we are.

The only thing hanging  up anything is attorney's fees, and I remain of the opinion that your demand is unreasonable. I am also confident that the Court would agree.

Thus, we have agreed on some terms but not all.

*Id.* at 22-23. Talbott did not respond to Odom's last email.

Two days thereafter, on January 19, 2018, Odom served Talbott with the Offer of Judgment (doc. 46-1 at 2-3). As earlier noted, Rule 68 provides that any offer made under the rule is "considered withdrawn" if not accepted within 14 days. Talbott did not accept the offer within that period. Instead, on February 6, 2018, he sent Odom an email that read: "It is my understanding that we have resolved the amount owed to my client for unpaid wages and the only issues [*sic*] is attorney fees. If I am wrong, please advise. As for attorney fees, please advise if you agree to entitlement to fees and costs so that I can notify the Court accordingly." *Id.* at 30. Odom wrote in response:

> Having heard no response to my email [on January 17th], I
> served an Offer of Judgment upon you via hand delivery on
> Friday, January 19, 2018 in an effort to try and clarify
> things. The time-period to respond subsequently expired,
> thus rather clearly communicating that there was no
> agreement on any resolution. I therefore know of nothing
> on which we can report to the Court.
>
> If you have some other ideas, please advise. Thus far the
> settlement negotiations have not worked, and neither did
> the Offer of Judgment.

*Id.* at 29. At or around this time, Talbott *allegedly* called Odom and told him that he

failed to accept the Rule 68 offer in time because it had been "misplaced" in his office

mail. Pl. Reply at 4-5.[12] Talbott then sent an email on February 7, 2018, telling Odom

that plaintiff would accept the offer if it was re-served (doc. 46-1 at 29). When Odom

did not respond, Talbott followed up two days later, on February 9, 2018:

> As of the date of this email, I have not received a response
> from you as to whether your client would still agree to
> allow us to accept the Offer of Judgment or whether you
> would re-serve same so that I could accept it. As I indicated
> earlier this week, I thought that we had resolved the case
> and that the only outstanding issue was resolving the fee
> issue, which the court could resolve same. You indicated
> that the matter was not settled—thus why you filed the
> Offer of Judgment (which I note was for the same amount
> to the client and was agreeing to entitlement to
> fees—reserving on amount). In essence, the Offer of
> Judgment was the same terms which I was under the
> understanding that we settled for. Nevertheless, since you
> will not re-issue the Offer, and because you will not agree
> to pay my client the amount indicated in the Offer and let
> the Court decide the fee (if we can't resolve same), then I
> must proceed with discovery.

---

12

   I say that Talbott "allegedly" called and told Odom the offer had been lost in his office mail
because that is reflected in an email from Talbott dated March 20, 2018 [doc. 42-5 at 2], but Odom
denies it (doc. 46-2 at 3) ("We did not have a telephone discussion about that.").

*Id.*

Later that day, Odom responded to Talbott and explained that he did not reply sooner because he had not received a definitive answer from his clients as to whether they would authorize him to re-serve the Offer of Judgment, but he said he thought it would be unlikely—apparently because it would have the effect of voiding the prior one (doc. 46-1 at 28). "However," the email then went on to say, "that does not mean that the parties cannot settle. It may change the equation to some degree, but if you have some *firm settlement offer*, I would be happy to take it to my client. I just keep getting the impression that you were playing games regarding this. Of course, to have a settlement we have to agree on all terms, not some." *Id.* (emphasis added). Talbott didn't respond to this February 9th email—let alone make a firm settlement offer—so the case continued for the next month and a half.

It appears the next time the attorneys discussed settlement was orally on March 19, 2018, immediately prior to the plaintiff's deposition. According to Odom, Talbott said at the time that he was now seeking over $10,000 in attorney fees, plus costs, and that the stated basis for the rising fees was his contention that his office had either lost or misplaced the Offer of Judgment, which had prevented him from accepting it in time. *See* Def. Resp. at 13-14.

The next day, on March 20, 2018, Talbott emailed Odom and said that he was willing to settle the wage claim for $496.62, and he would agree to reserve the issue of attorney fees and costs and let the court decide that issue (doc. 42-5 at 2). The email continued: "Of course, you can make your arguments about attorney fees. However, until I have something definitive from your client, I still have to proceed forward with litigation, which potentially creates an increased expense for your client. I await your response." *Id.*

Odom wrote a lengthy letter in response on March 28, 2018 (doc. 46-2 at 2-4). The letter began:

> I write this letter in response to your e-mail from the evening of March 20, 2018 in the above-referenced matter.
>
> * * *
>
> I understand your sensitivity on the case. I also understand your motivation to rewrite history. And I know you do not want to be perceived as placing other interests above those of your clients. I must nevertheless respond to the statements in your e-mail. Because most of our communications have been in writing, that definitely makes it easier.

*Id.* at 2. The letter proceeded to detail and summarize the entire history of settlement discussions and correspondence in the case to date, albeit from Odom's point of view. *See id.* at 2-3 He concluded with the following:

> [By email February 7, 2018] you . . . indicated that if we re-served the Offer of Judgment, you would accept it. As we have discussed since, serving another Offer of Judgment would effectively void the prior one. I was not willing to do that.
>
> Nevertheless, I still wanted to engage in settlement discussions. In fact, I e-mailed you on February 9 and indicated that just because the Offer of Judgment had expired "does not mean that the parties cannot settle." I therefore inquired whether you had a firm settlement offer and indicated that I would gladly take it to my client. You offered nothing in response.
>
> In fact, the next discussion which we had was oral, wherein you claimed to have over $10,000 in attorneys' fees—and the basis for the rising attorneys' fees was your office's having allegedly lost the Offer of Judgment (or possibly misplaced it). How my client should be held responsible for an error in your office was mystifying. We thus did not come to terms prior to the plaintiff's deposition.

* * *

> Under these facts, I must take it with a grain of salt when you send e-mails claiming that you are the one trying to settle—especially given the statements that you made to me when the joint report was being prepared about how you intended to run up attorneys' fees. I feel that continues.
>
> Regardless, all rhetoric aside, if you have a settlement demand that you want me to take to my client, I can do that. Unfortunately, however, you only want to talk in generalities and then claim to have increased fees and costs. There also definitely seems to be a pattern there.

*Id.* at 3-4.

Discussions continued thereafter, but they deteriorated. Over a five-day period (from April 4, 2018, through April 9, 2018) Talbott and Odom exchanged at least 27 emails with each other [doc. 46-2 at 6-29], and they became increasingly hostile. *See, e.g., id.* at 11 ("Your email is a lie!"); *id.* at 25 ("Stop playing games"); *id.* ("I am not playing games . . . . But the name calling really is not productive."); *id.* at 26 ("I am not going to continue to email you if you insist on your passive aggressive comments, as I too could have made same."). I will not quote from all the emails. Suffice it to say, Odom has aptly described them as "somewhat parallel conversations regarding the difference between an *offer of judgment* [under Rule 68] and a *consent to the entry of a judgment*." Def. Resp. at 14-15 (emphasis added). Odom explained that the former had expired months before and he was not going to re-serve it, but he *would* agree to the latter. On April 5, 2018, Odom attempted to state his position clearly:

> In short, defendants will consent to the entry of a judgment in favor of the plaintiff in the amount of $496.62, with the court reserving jurisdiction to determine reasonable attorney's fees and costs in light of the circumstances, upon proper motion.
>
> I simply do not know how to be more clear.

*Id.* at 9. Talbott responded that he wanted the judgment to explicitly state that plaintiff was the prevailing party and that he was entitled to his "attorney fees and costs," but make no reference to the defendants' rights under the Rule 68 Offer of Judgment. *See id.*; *see also id.* at 16 (Talbott's proposed judgment language). Odom sent an email at 9:57 a.m. on April 9, 2018, where he wrote:

> The language which you propose wants to say that plaintiff is entitled to fees and costs but is silent as to what defendant is entitled to. Since we will both be filing motions for fees or costs, you seem to be suggesting that only your side of it be addressed.
>
> If you just step back from the equation and look at it objectively, or perhaps have someone else look at it objectively, I think you will see that what I proposed accomplishes everything that you need and does not prejudice either party.

*Id.* at 25. It doesn't appear that Talbott responded to this email. Instead, the next day he conducted three depositions in the case, and, in the weeks that followed, the parties finalized discovery and then drafted/responded to the motions for summary judgment noted earlier. At the end of all that, the plaintiff reportedly amassed the $28,351.00 in fees that he now seeks.

(ii)

I have to answer two questions in ruling on plaintiff's motion for attorney fees, neither of which is particularly close.

First, is the plaintiff entitled to recover all of his attorney fees, including those that he incurred *after* the Rule 68 Offer of Judgment? Obviously, he is not. I recognize that an FLSA plaintiff's failure to timely accept a Rule 68 offer does not, by itself, cut off his right to recover post-offer attorney fees. However, as one leading commentator has observed:

> If the underlying fee-shifting statute [like the FLSA] does not define attorneys' fees as a part of costs, the making of a Rule 68 offer does not automatically cut off plaintiff's right to seek a fee award for post-offer legal work. . . . This does not mean, however, that the making of a Rule 68 offer is entirely irrelevant to the award of fees in a case involving a fee-shifting statute that does not treat fees as a part of costs if plaintiff rejects a Rule 68 offer and fails to obtain a more favorable judgment. In setting reasonable attorneys' fees, a court is to look to the results obtained, and it need not close its eyes to the reality that plaintiff's post-offer legal work produces a net loss. . . . [Thus] defendants can curtail, if not eliminate, fee awards for post-offer work even in cases not directly affected by Rule 68.

12 Charles A. Wright, *et al.*, *Federal Practice and Procedure* § 3006.2 (2d ed. 1997). Notably, Professor Wright relied on the Ninth Circuit's opinion in *Haworth* for the above proposition, and he quoted that case as saying: "'Just because a plaintiff has an FLSA violation in [his] pocket does not give [him] license to [ignore a Rule 68 offer], run up the attorney fees and then recover them from the defendant.'" *Id.* In deciding what, if any, post-offer fees would be reasonable, *Haworth* noted that courts should consider the amount of the Rule 68 offer, the stage of the litigation when the offer was made, what services were rendered thereafter, the amount that was ultimately obtained by judgment, and whether it was reasonable to continue litigating the lawsuit after the Rule 68 offer was made. *See* 56 F.3d at 1052-53. Because the Offer of Judgment here was served early on and was for the *maximum* that plaintiff could recover under the statute, each factor weighs heavily against awarding any fees incurred after the offer.[13]

---

[13]
    To the extent Talbott has suggested that his failure to accept the Rule 68 offer in time should be forgiven because he claims he told Odom that it was misfiled in his office mail, I must reject this argument for two reasons. One, he is not entitled to the benefit of the doubt because (i) throughout this case he *consistently* failed to respond to all settlement offers (some of which, like the Offer of Judgment, were time-limited), and (ii) he made at least one statement in this case that turned out to be demonstrably untrue and another one that is questionable. *See supra* notes 11 and 12. Two, even if his claim on this point had been true, there is no "lost in my office mail" exception to Rule 68.

The second question I must decide is whether Talbott is entitled to attorney fees that *pre-dated* the Rule 68 Offer of Judgment, which is what he has requested in the alternative. After full and careful review of the entire record, I find that plaintiff is not entitled to any fees in this case because Talbott filed and pursued the litigation in bad faith. There are a number of things that support this conclusion.

For example, Talbott made no effort to contact Breton before filing suit. "While the Court recognizes that the FLSA does not contain any pre-suit notice or demand requirement, given the very small amount at issue it is likely this matter could have been resolved without the necessity of filing suit." *Nelson*, 2018 WL 3059980, at *3 n.2.[14] Indeed, Breton later offered to pay plaintiff the maximum amount that he could possibly recover under the statute on January 5, 2018, which was less than two months after he answered the complaint and less than one month from the date of the parties' planning meeting. The quickness with which the defendants offered to pay plaintiff's *full* damages supports the conclusion that this lawsuit was unnecessary and could have probably been avoided with a pre-suit letter or phone call. Had Talbott been successful in doing that it would have benefitted the defendants (by providing them with an early opportunity to change course and comply with the law); it would have benefitted the

---

[14]

As previously noted, in *Sahyers*, the Eleventh Circuit affirmed the district court's decision to deny attorney fees to a prevailing FLSA plaintiff. The district court had denied those fees, in part, because at no time prior to bringing the lawsuit did plaintiff's counsel attempt to resolve the matter. The district court noted that:

> Absent any pre-suit demand, a defendant who unknowingly failed to compensate an employee for overtime would have no opportunity to voluntarily do so outside of litigation. As a result, such a defendant would be subject to additional litigation expenses and attorney's fees despite its good faith desire to properly compensate the employee. Furthermore, additional judicial time and resources would be spent on unnecessary litigation.

*Sahyers v. Prugh, Holliday & Karatinos P.L.*, 2008 WL 9396456, *2 (M.D. Fla. 2008); *accord Goss*, 248 F. Supp. 2d at 1168 (denying attorney fees to prevailing FLSA plaintiff because, *inter alia*, the case "should have been a *pro forma* matter that could have been disposed of by making a few phone calls before filing suit").

plaintiff (by getting the unpaid wages to him much more quickly); and it would have benefitted this federal court (by preserving judicial resources). But, alas, it would not have benefitted Talbott as he wouldn't have been able to generate large fees.

Talbott not only failed to make an effort to resolve this dispute pre-suit, but he also didn't respond to Breton's *post*-complaint letter, dated September 25, 2017. This letter presented Talbott with an opportunity to explain to Breton what the dispute was about (*i.e.*, the decision to withhold plaintiff's final paycheck as opposed to how much he was paid hourly), and, once again, it would have given Breton an early opportunity to comply with the FLSA. Even if Breton refused, at least a letter or phone call could have made clear to him that his September 25th certified letter wasn't a formal answer to the complaint. Instead, Talbott ignored the letter and waited until the time ran out for the defendants to file an answer, and then he filed three motions for default—even though he knew they weren't just ignoring the lawsuit. The motions were granted, but the defaults were withdrawn when the defendants subsequently moved to vacate. All of that was a completely unnecessary waste of resources that could have been avoided with a short letter or phone call. But, again, that wouldn't have generated fees.

In addition, as set out above, Talbott refused numerous attempts to settle while threatening—and carrying out—sizable discovery that was totally unwarranted by the nature of the case and damages at issue. Although Talbott claimed that he was willing to settle and call off discovery, his actions belied those claims as it appears clear from his conduct that he was never actually interested in settling. He kept coming up with implausible reasons and justifications for not reaching a final agreement in this action, including that he needed the judgment to explicitly say that he was entitled to fees and costs (even though he was always free to move and make that argument later) with no mention of any similar rights that defendants may have had. It was understandable that Odom was concerned that might prejudice his clients, and he was reluctant to include such language in a judgment that he repeatedly said he would otherwise consent to.

It is apparent that the foregoing was by design as the record plainly shows that Talbott was churning the file to prolong the litigation and run up his attorney fees. For example, he kept PRCP in this lawsuit—and insisted on separately deposing Breton as the corporate representative for that entity—even after it was or should have been obvious that plaintiff had never worked there. And instead of dismissing PRCP from this case, Talbott waited until Odom moved for summary judgment and then he filed a nine-page response to that motion with 47 pages of exhibits, all of which to say that he *agreed* PRCP was "due to be dismissed."

Similarly, Talbott filed a 31-page motion for summary judgment with 90 pages of exhibits for the $496.62 unpaid wages claim. To prepare and draft this motion, he booked 15.7 in attorney hours [doc. 42-7 at 18], which totaled $3,591.50—more than six times(!) what the plaintiff stood to be awarded if he prevailed on everything in the case. If that were not bad enough, even though the defendants expressly agreed to pay the full $496.62 in their response to that motion, Talbott filed a 10-page reply to their response, requesting that plaintiff be awarded the $496.62 that the defendants had just stipulated to. And for that reply he logged another 4.7 attorney hours, which came to an additional $1,010.50. *Id.* at 19.

In opposing the plaintiff's motion for attorney's fees, Odom has painstakingly gone through Talbott's time sheets to show even more file-churning and bill-padding. *See* Def. Resp. at 16-23. He has noted numerous examples of "hyper-inflated" billing that he describes as "absurd," "shocking," and "nothing short of a disgrace." *See id.* In his reply, Talbott didn't really address that claim at all—other than to say in passing that "every hour worked on behalf of Plaintiff was justified and compensable[.]" *See* Pl. Reply at 9. He most likely didn't try to defend against the specific charges because there appears to be no defense. Indeed, here are some of the purportedly "justified and compensable" hours that Odom noted:

• On May 18, 2017, Talbott tallied 3.0 hours ($1,050) for drafting the mostly boilerplate complaint. The complaint contained very few factual allegations specific to this case, and there is no way that it required an experienced FLSA lawyer to spend three hours drafting it.

• On June 15, 2017, Talbott listed 0.2 hours drafting a letter to PRC regarding the filing of the case, 0.2 hours drafting the same letter to PRCP, 0.2 hours drafting the same letter to Breton, 0.2 hours preparing a Notice of Wavier of Service on PRC, 0.2 hours preparing the same Notice of Waiver of Service on PRCP, and 0.2 hours preparing the same Notice of Waiver of Service on Breton. He also added 0.2 hours for reviewing the docket—but since the suit had just been filed the previous day, there was nothing to see but verification that suit had been filed. In all, Talbott claimed 1.4 hours ($490) for looking at the docket the day after the lawsuit was filed and drafting six short letters and notices to the defendants telling them that they had been sued and asking them to waive service of process. However, those letters are all *standard form letters* ordinarily handled by secretaries or paralegals—not attorneys billing $350 per hour, as Talbott seeks in this case.

• On November 15, 2017, Talbott added 0.2 hours to review a one-sentence Notice of Appearance, 0.2 hours to read PRC's one-sentence Corporate Disclosure Statement, and 0.2 hours to read the one-sentence Corporate Disclosure Statement for PRCP. In other words, Talbott accrued 0.6 hours ($210) to read three sentences.

• On February 23, 2018, Talbott logged 2.1 hours ($735) to draft nine Notices of Deposition (one of which he inadvertently included twice). These notices, however, were identical except for the name of the deponent and the time of their appearance. It is hard to conceive of a reason—other than running up the bill—that would justify such a routine task being done by the lead and named attorney in a law firm instead of his secretary or paralegal.

• Several of the foregoing depositions had to be rescheduled after they were set. As before, Talbott drafted the notices himself and, incredibly, he listed the exact same amount of billable time for each *amended* notice. So, for example, he logged 0.4 hours on February 23, 2018, for the deposition notice of PRC's corporate representative, and he added another 0.4 hours when he had to amend that notice on March 12, 2018, to change the day/time of the deposition.

I could go on, but it is not necessary to belabor the obvious. To be sure, Talbott has not even tried to defend the foregoing, nor could he. His billing records are both inflated and unprofessional. And, they only further reinforce my conclusion that he acted in bad faith from the outset of this lawsuit. There is simply no justifiable reason why he accumulated 103.9 hours of attorney time, and 11.1 hours of paralegal time, for a claimed fee of $28,351.00 on a case with a maximum of $496.62 at issue.[15]

In closing, while this dispute *probably* could have been resolved prior to filing suit, it *unquestionably* could have been resolved on January 5, 2018 (less than two months into the case), when the defendants offered to settle the unpaid wage claim for the full amount of $496.62, including liquidated damages, and $2,000 in attorney fees and costs. Given the nature of the case and the amount of time that Talbott reasonably *should* have invested up to that point, $2,000 was very generous. However, Talbott refused because he said that amount would not adequately compensate him since he had by then invested approximately 18.6 attorney hours, 2.4 hours in paralegal time,

---

[15] This is not to say, of course, that such a lopsided fee award could never been justified. For example, in *DaSilva, supra*, 2009 WL 10667450, the district court awarded $21,130 in attorney fees where the plaintiff only obtained a $218.83 judgment. However, that amount was awarded by a jury after a trial where the plaintiff was seeking much more. Indeed, the plaintiff in that case sued on his own behalf and all "other similarly situated employees," and he was seeking compensation for 196 hours of overtime. *See id.* at *1. The jury, however, "limited his recovery to only 18 hours of unpaid overtime." *Id.* In our case, by contrast, the damages at issue were always in the nuisance value range, and there was never any hope or possibility for anything more.

and $450 in costs. But, as detailed above, that was only because he blatantly inflated his hours and costs—*e.g.*, by charging 3.0 hours/$1,050 for a boilerplate complaint, billing attorney time for standard form letters and notices usually done by secretaries or paralegals, and filing three motions for default that should have never needed to be filed. After refusing that early and reasonable settlement offer, the litigation continued for more than five months—with lengthy depositions and court filings—until June 20, 2018, at which point the plaintiff obtained a judgment in the exact same amount that had been offered on January 5th. Although Talbott claims in his motion that he should be awarded fees because he "expediently and with great skill achieved in the excellent result for the Plaintiff" [Pl. Mot. at 20], he actually did the exact opposite. He dragged this exceedingly simple and straightforward lawsuit out as long as he could and made his client wait to receive what the defendants had offered several months before. His unprofessional conduct shocks the conscience of the court, and he will be awarded no attorney fees. A "reasonable fee" in this case is no fee.

Nevertheless, Talbott should consider himself lucky. The defendants could have requested that I order him to pay some or all of *their* attorney fees, but they expressly declined to do so. *See supra* note 7. Had they asked, I would have granted that request as an appropriate sanction.

## II. Conclusion

For all the reasons set forth above, the defendants' motion for costs (doc. 39) is GRANTED. The plaintiff shall pay the defendants, jointly, $1,133.54 in costs, and judgment shall be entered against plaintiff therefor. The plaintiff's motion for attorney fees (doc. 42) is DENIED in its entirety.

The clerk is directed to close this case.

DONE and ORDERED this 2nd day of November, 2018.

/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge